IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YENG XIONG,<br><br>　　　　　　Plaintiff,<br>　　v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　　　Defendant.<br>_____ | Case No.: 1:10-cv-01671 JLT<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. 15)<br><br>ORDER DIRECTING REMAND PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g) AND DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF YENG XIONG AND AGAINST DEFENDANT COMMISSIONER OF SOCIAL SECURITY |

  Yeng Xiong ("Plaintiff") asserts she is entitled to disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff argues the administrative law judge ("ALJ") erred in evaluating the testimonial evidence by failing to set forth clear and convincing reasons for discounting her credibility. In addition, Plaintiff contends the ALJ erred in evaluating the medical evidence, and failed to rely on the proper hypothetical question posed to the vocational expert. Therefore, Plaintiff seeks judicial review of the administrative decision denying benefits her claims for benefits.

  For the reasons set forth below, Plaintiff's motion for summary judgment (Doc. 15) is **GRANTED** and the matter is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

///

**PROCEDURAL HISTORY**[1]

Plaintiff filed applications for disability insurance benefits and supplemental security income, alleging disability beginning January 29, 2007.[2] AR at 10, 103-17, 128-30. Plaintiff's applications were denied initially and upon reconsideration. *Id.* at 43-62. Plaintiff requested a hearing, which was held before an ALJ on April 14, 2009. *Id.* at 20. The ALJ determined Plaintiff was not disabled as defined by the Social Security Act and issued an order denying benefits on May 13, 2009. *Id.* at 10-19. Plaintiff requested a review by the Appeals Council of Social Security, which denied review of the ALJ's decision on July 15, 2010. *Id.* at 1-6. Therefore, the ALJ's determination became the decision of the Commissioner of Social Security ("Commissioner").

**STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938). The record as a whole must be considered, as "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

**DISABILITY BENEFITS**

To qualify for benefits under the Social Security Act, Plaintiff must establish she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

[2] The alleged onset date was amended to February 1, 2007 at the hearing before the ALJ. AR at 10, 24.

that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). When a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounis v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2010). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* In making these determinations, the ALJ must consider objective medical evidence and opinion (hearing) testimony. 20 C.F.R. §§ 404.1527, 416.927, 416.929.

**A.   Relevant Medical Evidence**[3]

On February 1, 2007, Dr. Kin-Chung Chan observed Plaintiff was "somewhat depressed" because she suddenly lost her vision. AR at 233. Dr. Chan attributed Plaintiff's vision loss to a sudden increase in high blood pressure, which was caused by Plaintiff's poor compliance with her medication. *Id.* at 233-34.

---

[3] Plaintiff does not dispute the evaluation of the medical evidence regarding her physical impairments, or the finding that she can perform light work. Rather, Plaintiff's appeal focuses on her mental impairments. Therefore, the Court's review of the medical evidence is limited to notes and opinions regarding her mental impairments.

In March 2007, Plaintiff's treating physician, Dr. Long Thao, found Plaintiff's hypertension was controlled, and did not indicate Plaintiff had psychological problems, such as anxiety, stress, or depression. *Id.* at 295, 298. Likewise, in July 2007, Dr. Thao opined Plaintiff's hypertension was under "better control," and again did not indicate Plaintiff suffered from psychological symptoms. *Id.* at 318.

Merced County Department of Mental Health completed an initial psychiatric assessment on November 14, 2007. AR at 335-39. Plaintiff reported she was "depressed nearly everyday from current condition and issues." *Id.* at 340. She stated she heard voices, had "difficulty falling asleep and depends on medication at night, fatigue nearly everyday and sleeps on and off during the day, [and] loss of appetite," which resulted in "difficulty concentrating." *Id.* Plaintiff's husband said she was "easily irritable," with anger outbursts three times per week, and she "[did] not have the patience to stay at home for more than 4 hours during the day." *Id.* Plaintiff's social worker, Ge Thao, opined: "Client's mental condition is resulted from acculturation issues of not being able to speak English, not being able to drive, difficulty accessing health care, unable to accept client's physical condition, and lack of abilities to function daily." *Id.* Plaintiff was unable to maintain activities of daily living, and required assistance to turn on water to brush her teeth. *Id.* Plaintiff was diagnosed with a major depressive order, severe, with psychotic features and general anxiety. *Id.* at 342.

On January 23, 2008, Dr. Leng Mouanoutoua completed an assessment of Plaintiff's ability to do work-related activities. AR at 330-31. According to Dr. Mouanoutoua, Plaintiff had a poor ability to follow work rules; deal with the public; use judgment; interact with supervisors; deal with work stress; function independently; maintain attention and concentration; and to understand, remember, and carry out complex and detailed job instructions. *Id.* He opined Plaintiff had a fair ability to relate to co-workers and to understand, remember, and carry out simple job instructions. *Id.* Dr. Mouanoutoua believed Plaintiff had a poor ability to maintain her personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. *Id.* at 31. Dr. Mouanoutoua did not complete the portion of the form in which he was to "identify the particular medical or clinical findings" that supported his assessment, or offer an

opinion regarding the earliest date the assessment described Plaintiff's work-related limitations. *See* AR at 330-31.

Dr. Puthiaparampil began treating Plaintiff on March 19, 2008. AR at 332-39. Plaintiff complained of feeling depressed, hopeless, and useless. AR at 332. According to Plaintiff, she heard voices that called her names and she had nightmares of her experiences in Laos, which caused interruptions with her sleep. *Id.* at 332-33. Further, Plaintiff reported her memory was impaired. *Id.* at 333. She said her symptoms increased "since she became partially blind from diabetes [and] hypertension." *Id.* at 332. Dr. Puthiaparampil diagnosed Plaintiff with major depression with psychotic features and post-traumatic stress disorder, although Plaintiff "report[ed] no traumactic (sic) experience." *Id.* at 332-33, 335. Dr. Puthiaparampil assessed Plaintiff's overall functioning with a GAF score of 41.[4] *Id.* at 338.

On April 17, 2008, Dr. Puthiaparampil saw Plaintiff for a follow-up appointment after prescribing Lexapro. AR at 417-18. Plaintiff's husband reported there was "some improvement in her depression," because Plaintiff was sleeping and eating better. *Id.* at 417. However, Plaintiff reported she still heard someone calling her name. *Id.* Therefore, Dr. Puthiaparampil opined Plaintiff had a "partial" response to medication, and increased the Lexapro and added Abilify to the treatment plan. *Id.*

In May 2008, Dr. Puthiaparampil opined Plaintiff's response to the medication was "good," because she was improving with the medication. AR at 416. Plaintiff was "less depressed," but still complained about her visual impairment and angered easily. *Id.* Dr. Puthiaparampil opined Plaintiff "is unable to take care of herself due to physical [and] mental limitations," and was "not able to work." *Id.*

On September 16, 2008, Plaintiff's husband reported Plaintiff was "doing better" to Dr. Puthiaparampil. AR at 414. According to her husband, she was not talking to herself and was less

---

[4] Global Assessment Functioning ("GAF") scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV). A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

5

depressed. *Id.* In addition, Plaintiff was eating better and sleeping with the help of Ambien. *Id.* Likewise, on October 21, 2008, Dr. Puthiaparampil noted Plaintiff was "less depressed" with her medication, heard fewer voices, was eating and sleeping better, and had no suicidal thoughts." AR at 412. In addition, Dr. Puthiaparampil observed Plaintiff's mood was calm, and she appeared alert and oriented. *Id.*

On November 8, 2008, Mr. Tao completed an "annual assessment update" on Plaintiff, and noted "some of [her] symptoms have been reduced and managed with medication." AR at 348-49. However, Mr. Tao believed Plaintiff "continue[d] to have difficulty reducing and eliminating her symptoms without services." *Id.* at 348. According to Mr. Tao,

> [Plaintiff] continued to be depressed nearly everyday from unchanged physical difficulties with poor sight vision, poor health of diabetes and hypertension, acculturation issues with language and cultural barriers, adjustment issues with loss of abilities to walk faster, does not drive, does not eat family meals due to diabetes and has to eat other foods during dinner, and unacceptance of her physical condition. In addition, she has poor self-esteem and feelings of helplessness . . . She has difficulty sleeping and relies on medication to help her sleep but continues to wake up early in the morning and ruminate about her current situation. Is fatigue [sic] nearly everyday from poor sleep and mood, has poor concentration with uncontrollable thoughts about her current condition, is easily forgetful and relies on family members and organizations to remind client to make her appointments, has psychomotor agitation and wants to leave her home nearly every day from frustration and exhaustion, has lost of [sic] interest to discuss about her condition with family members, increase isolation with herself when at home, and has not been able to eliminate her enrage feelings causing [Plaintiff] to have thoughts of death and 1x per month having [suicidal thoughts] w/out plan.

*Id.* at 348. He observed Plaintiff's mood was depressed and she had "short-term memory." *Id.* However, Mr. Tao opined Plaintiff's strengths included being able to maintain activities of daily living with assistance, family support, and that she was "willing to continue services to eliminate at risk thoughts." *Id.* Plaintiff was given a GAF score of 45. *Id.*

On December 16, 2008, Dr. Puthiaparampil noted Plaintiff felt "less depressed" with her medication, heard fewer voices, slept better, and "no thought to hurt herself." AR at 411. Also, Plaintiff's speech was "goal directed," and she was "alert [and] oriented." *Id.* Therefore, Dr. Puthiaparampil opined Plaintiff had a "good" response to her medication. *Id.* at 410-11.

Dr. Sahota treated Plaintiff at Merced County Department of Mental Health on February 9, 2009. AR at 410. Dr. Sahota noted Plaintiff "reported benefit from medications" and compliance with treatment. *Id.* Plaintiff stated her mood was "sad," and stated it was a "6" on a scale of 1 to 10.

6

*Id.* In addition, Plaintiff reported she did not hear any voices, and "[d]enied any suicidal or homicidal ideations." *Id.* According to Dr. Sahota, Plaintiff's thoughts were "organized and goal directed," with fair insight and judgment. *Id.*

Dr. Patricia White completed a psychiatric evaluation upon the referral of Plaintiff's counsel, Robert Kolber, on April 6, 2009. AR at 419-22. Dr. White reviewed Plaintiff's medical records and noted Plaintiff was taking Lexapro and Abilify for her psychiatric condition. *Id.* at 419-20. Dr. White noted:

> [Plaintiff] voiced psychological complaints of sadness, frustration, irritability, pessimism about her future, feelings of being useless and worthless because of not being able to do what she once did in the home, of not being able to sleep because of nightmares continuing images of her traumatic experiences as a child, of thinking that she would be better off dead, of not feeling close to her children and husband as she once did, and not being able to cope with or accept her present level of impaired functioning.

*Id.* at 420. Plaintiff reported her depressive symptoms were "relatively unchanged by the use of anti-depressant medication." *Id.* at 421. Dr. White opined Plaintiff, "by reason of combined mental and physical impairments, is presently precluded from substantial gainful activity at this time and is likely to remain so impaired for a further period of twelve months or more." *Id.* at 422.

In addition, Dr. White completed a medical source statement concerning the nature and severity of Plaintiff's mental impairments. AR at 423-27. Dr. White opined Plaintiff was "mildly limited" with the "ability to understand and remember very short and simple (one-or two-step) repetitive instructions or tasks," and "moderately limited" with her ability to carry such tasks. *Id.* at 423-24. With "detailed (three or more steps) instructions or tasks, Plaintiff was "moderately limited" in her ability to understand and remember, and "markedly limited" with her ability to carry out the tasks. *Id.* In addition, Dr. White believed Plaintiff was "markedly limited" in her ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual with customary tolerances; to sustain an ordinary routine without special supervision; and to complete a workweek without interruptions from psychologically-based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 424. Dr. White indicated Plaintiff was "markedly limited" in all areas of adaptation

and in several areas of social interaction. *Id.* at 424-25. Dr. White noted she believed the onset date for Plaintiff's limitations was February 2007. *Id.* at 426.

**B.     Administrative Hearing**

Plaintiff was represented by counsel, Mr. Kolber, who gave an opening statement at the hearing. AR at 22. Mr. Kolber requested that the alleged onset date be changed to February 1, 2007, to be "consistent with the evidence." *Id.* at 24. Mr. Kolber stated Plaintiff was "not disputing" the fact that she had improved physically and was able to perform light work. *Id.* at 25. In addition, Mr. Kolber conceded "there's little evidence that she is blind and "the evidence does not support blindness sufficient to meet the listings." *Id.* at 28-29. Mr. Kolber reported Plaintiff's "primary impairment . . . [is] her mental impairment. . . . [W]e are contending that she has a serious psychiatric disorder which commenced at the same time of her physical problems." *Id.* at 25.

Mr. Kolber reported that he sent Plaintiff to Patricia White, a Board-certified psychiatrist who had been employed by the government to give testimony as a medical expert on behalf of the Office of Disability Adjudication and Review. AR at 25. According to Mr. Kolber, Dr. White reviewed Plaintiff's mental treatment records and examined Plaintiff prior to offering a medical assessment. *Id.* at 26.

*1.    Plaintiff's Testimony*

Plaintiff reported she had a driver's license but was no longer able to drive. AR at 30-31. Plaintiff said, "I can't see very well, and that give[s] me a lot of problems." *Id.* at 30. For example, Plaintiff testified she was unable to do household chores, and she "hardly" went shopping due to her poor vision. *Id.* Also, Plaintiff said she did not visit friends or family, but she would "stay home mostly." *Id.* at 31-32. However, her mother-in-law visited, and Plaintiff attended Hmong celebrations such as the New Year's celebration. *Id.* at 31.

According to Plaintiff, she listened to the radio when someone would tune it to the channel she liked, but she was unable to see the television, so she "hardly ever watch[ed] it." AR at 31. Plaintiff described her typical day as follows:

> When I get up in the morning usually come sit, wait until the meal is . . . prepared and cooked and I eat meal and after that I'll sit on a sofa in a room for a while and if I want to go out, I go out the back door and, and to the outside and back, that's all.

*Id.* at 31-32.  She reported her husband sometimes took her to the park, but she did not go to school activities for her children.  *Id.* at 32.  Plaintiff said she had "no friends," but did not know whether she could "get along with people or not."  *Id.* at 34.

Plaintiff testified she was taking medication for her high blood pressure and diabetes, and that she was keeping her blood pressure under control.  AR at 32.  Also, Plaintiff stated she received treatment twice a week for her mental health at Merced Lao Family clinic, where she attended individual and group therapy sessions.  *Id.* at 33.  She said she took medication that minimized the number of nightmares she experienced and helped her to feel less depressed.  *Id.*  According to Plaintiff, her nightmares were "very regular every night," but with treatment had decreased to "once or twice a week."  *Id.* at 34.  Though Plaintiff said she heard voices, the medication "helped to lessen the frequency."  *Id.*  Plaintiff said she could try to concentrate, but when she was angry was unable to do so.  *Id.*  According to Plaintiff, she had a problem with anger and said, when "really angry," she thought about taking a knife and stabbing herself to death.  *Id.*

   *2. Vocational Expert Testimony*

Vocational expert Cheryl Chandler ("VE") testified after Plaintiff at the hearing.  Plaintiff did not have prior substantial gainful activities for the VE to characterize.  Therefore, the ALJ asked the VE to consider hypothetical individuals "of the same age, education and work background as [Plaintiff]."  AR at 37.

First, the VE assumed an individual who "could lift and carry 20 pounds occasionally, 10 pounds frequently; sit/stand or walk six hours; and [had] to avoid hazards, unprotected heights, dangerous machinery, open bodies of water; and was unable to climb ladders, ropes or scaffolds."  AR at 37.  Also, the worker was "restricted to simple routine tasks."  *Id.*  The VE opined that within the frame of light, unskilled work, "there would be some positions where language is not a factor."  *Id.*  As examples, the VE identified occupations including "food prep work," work in a kitchen as a dishwasher (DOT 318.687-048), and laundry worker (DOT 302.685-010).  *Id.* at 38.  However, if this worker was unable to maintain concentration for more than thirty minutes at a time, the VE believed no jobs would be available.  *Id.* at 41.

Further, the ALJ asked the VE to consider a worker who had "fine binocular vision." AR at 38. The VE responded that she would not put the worker in a kitchen, because she "might inadvertently bump things." *Id.* at 39. The ALJ conceded that food preparation would not be an appropriate position. *Id.* Mr. Kolber observed that with "dishwashing you'd probably have to be able to see if the plate was clean or not and with laundry you'd have to be able to see [a] spot . . . to do an adequate job." *Id.* Based upon this statement, the VE believed there would not be jobs available. *Id.* If the worker's vision was "simply monocular" and clear, the VE did not believe there would be a problem with any of the jobs. *Id.* at 40.

Next, the ALJ posed a hypothetical based upon the assessment of Dr. White. AR at 40. The VE assumed the individual had 20/20 vision; could stand, sit, and walk six hours; and had to avoid concentrated hazards. *Id.* In addition, the worker was unable to perform work with one or two step instructions, work in coordination with others, make simple work-related decisions, or interact appropriately with the public. *Id.* The VE concluded no jobs would be available. *Id.*

## C. The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity from the amended disability onset date of February 1, 2007. AR at 12. Second, the ALJ found Plaintiff had the following severe impairments at the alleged onset: hypertension; chronic kidney disease, stable; IgA nephropathy, stable; diabetes mellitus type II; and partial vision loss in one eye, of uncertain etiology. *Id.* In addition, "on and after November 2007," Plaintiff suffered from a major depressive disorder. *Id.* These impairments did not meet or medically equal one of the listed impairments. *Id.* at 13.

The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform light work. AR at 14. However, the ALJ set forth the following limitations: "She must avoid climbing ladders, ropes and scaffolds; and avoid concentrated exposure to hazards such as working at heights, around dangerous machinery, or over water." *Id.* The ALJ found that "[a]t the minimum, [Plaintiff] is able to perform tasks requiring monocular vision." *Id.* Finally, the ALJ found Plaintiff "has the mental capacity to understand, remember, and carry out simple routine tasks." *Id.*

1 The ALJ noted Plaintiff did not have past relevant work, and therefore transferability of job skills was not an issue. AR at 18. Although Plaintiff did not have past relevant work to which she could return, the ALJ found, with the RFC defined above, "jobs that exist in significant numbers in the national economy that she can perform." *Id.* at 18. Therefore, the ALJ concluded Plaintiff was not disabled as defined by the Social Security Act. *Id.* at 19.

## DISCUSSION AND ANALYSIS

### A. The ALJ failed to identify clear and convincing reasons for rejecting Plaintiff's credibility.

In determining credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Here, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause only some of the alleged symptoms and that her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." AR at 17.

An adverse finding of credibility must be based on clear and convincing reasons where there is no affirmative evidence of a claimant's malingering and "the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which he complains." *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008). Further, an ALJ may not discredit a claimant's testimony as to the severity of symptoms only because it is unsupported by objective medical evidence. *See Bunnell*, 947 F.2d at 347-48. In addition, the ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834; *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).

Factors that an ALJ may consider in a credibility determination include: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct, (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment and (5) testimony of physicians concerning the

nature, severity, and effect of the symptoms. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v Barnhart*, 287 F.3d 947, 958-59 (9th Cir. 2002). Credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004). Here, the ALJ attributed "some of" Plaintiff's mental impairments to "acculturation issues" and considered the medical evidence in his determination that Plaintiff lacked credibility. AR at 17.

    *1.    "Acculturation issues"*

    The ALJ noted Plaintiff was "able to socialize appropriately in therapeutic group settings with fellow Hmong and attend Hmong cultural events." AR at 17. Therefore, the ALJ opined, "These factors suggest that acculturation issues may account for some of her projected difficulties in dealing with others, adapting, and withstanding stress." *Id.*

    Plaintiff argues the "acculturation issues might have contributed to her depression, but the fact remained that she was severely depressed." (Doc. 15 at 34). According to Plaintiff, the ability "to participate in treatment and group counseling with other Hmong speaking individuals . . . merely evidenced an ability to participate in her own mental health treatment." *Id.* On the other hand, Defendant argues, "Plaintiff's ability to attend her own culture's events suggests that lack of acculturation, rather than disability, impedes work. The ALJ is allowed to make logical inferences from the evidence." (Doc. 20 at 10) (citing *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996)).

    Significantly, Plaintiff did assert that she had difficulties dealing with others or withstanding stress. When questioned whether she had "any problems getting along with people," Plaintiff responded, "I have no friends . . . I don't know if I can get along with people or not." AR at 34. Thus, the fact that she participated in group therapy and attended the Hmong New Year celebrations does not contradict Plaintiff's statements and, therefore, is not a basis for discrediting Plaintiff's testimony.

    Although the ALJ is permitted to draw inferences from the evidence, there is no explanation how these "acculturation issues" would impact Plaintiff's ability to perform work in the national economy. As noted by the ALJ, Plaintiff "stated that she has difficulty in concentrating and still has

auditory hallucinations." AR at 17. The Court is unable to find a "logical inference" that cultural issues suffice as a reason for discounting Plaintiff's credibility, although difficulties with acculturation may have contributed to her mental impairment.[5] Consequently, this is not a clear and convincing reason for discounting Plaintiff's testimony.

### 2. Objective Medical Evidence

The ALJ also purported to discount Plaintiff's credibility because she concluded the medical record did not support the degree of symptoms alleged by Plaintiff. *See* AR at 17. As a general rule, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of the Soc. Sec. Admin*, 169 F.3d 595, 600 (9th Cir. 1999). However, "subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch*, 400 F.3d at 681 ("lack of medical evidence cannot form the sole basis for discounting pain testimony"); SSR 96-7p, 1996 SSR LEXIS 4, at *2-3 (statements "may not be disregarded solely because they are not substantiated by objective medical evidence").

Moreover, in citing the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to make a general statement that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, the ALJ must identify which "testimony is not credible and what evidence suggests the claimants are not credible." *Dodrill*, 12 F.3d at 918; *see also Holohan*, 246 F.3d at 1208 ("the ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony"). Here, the ALJ observed that Dr. Thao–who treated Plaintiff for her physical impairments– "did not any

---

[5] Plaintiff's social worker, Ge Thao, attributed her mental condition, in part, to "acculturation issues." However, Mr. Thao did not find Plaintiff was unable to socialize with others or withstand stress. Rather, he noted Plaintiff had "acculturation issues of not being able to speak English"and opined Plaintiff had "language and cultural issues." (AR at 340, 348). On the other hand, Dr. White did not attribute Plaintiff's mental impairments to a lack of acculturation, but opined Plaintiff's "severe depressive illness and anxiety symptoms" were "[l]argely in response to [the] sudden change in her physical health and the associated loss in her overall functioning." *Id*. at 421.

note signs of depression or record or post-traumatic stress disorder or record complaints of hallucinations" (AR at 17), which the ALJ believed conflicted with Plaintiff's testimony.  In addition, the ALJ observed, "[I]n February 2008 Dr. Chan noted that the claimant was much happier in spite of some vision loss." AR at 17 (citing AR at 398).  However, the ALJ failed to discuss Dr. Puthiaparampil's diagnosis of a major depressive disorder with psychotic features in March 2008. Dr. Puthiaparampil discussed Plaintiff's depression and complaints of auditory hallucinations in the course of his treatment. *See, e.g.,* AR at 332-33, 412, 417-18.  Nevertheless, even if the ALJ resolved the conflicts in the treatment notes of Dr. Thao and Dr. Puthiaparampil and, thus, satisfied the her obligation to identify the specific evidence that  conflicted with Plaintiff's testimony, the medical record alone is not a clear and convincing reason to reject Plaintiff's testimony.

The ALJ failed to set forth findings "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004). Therefore, the adverse credibility determination cannot be upheld because the ALJ failed to set forth clear and convincing reasons supported by substantial evidence in the record.

**B.      Remand is appropriate in this matter**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court.  *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation.  *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004), citing *INS v. Ventura*, 537 U.S. 12, 16 (2002).  Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).  In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed.  *Varney v. Sec'y of Heath & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir.

1988). The Ninth Circuit explained that "where the ALJ improperly rejects the claimant's testimony regarding [her] limitations, and the claimant would be disabled if her testimony were credited," the testimony could be credited as true, and remand is not appropriate. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996); *Smolen*, 80 F.3d at 1292.

However, courts retain flexibility in crediting testimony as true. *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (remanding for further determinations where there were insufficient findings as to whether the plaintiff's testimony should be credited as true). A remand for further proceedings regarding the credibility of a claimant is an appropriate remedy. *See, e.g., Bunnell*, 947 F.2d at 348 (affirming the order remanding for further proceedings where the ALJ failed to explain the basis for rejecting the claimant's testimony); *Byrnes v. Shalala*, 60 F.3d 639, 642 (9th Cir. 1995) (remanding the case "for further proceedings evaluating the credibility of [the claimant's] subjective complaints . . ."). Although the ALJ failed to properly reject Plaintiff's credibility using the proper legal standards, it is not clear that Plaintiff would be disabled if her testimony were credited as true. Based upon Plaintiff's complaints, Dr. White and Dr. Puthiaparampil opined Plaintiff was unable to perform work. *See, e.g. id.* at 416, 422. However, the ALJ did not address Dr. Puthiaparampil's opinion that Plaintiff could not work, and gave "limited weight" to the assessment of Dr. White.[6] Notably, there were no tests of Plaintiff's memory or concentration performed by treating or examining physicians. The Court is unable to determine whether Plaintiff would be disabled, and remand is appropriate for this matter.

## CONCLUSION AND ORDER

For all these reasons, the Court concludes the ALJ erred in assessing Plaintiff's credibility as related to her subjective complaints of an inability to concentrate and other mental impairments. Therefore, the Court will order the matter remanded for the ALJ to provide sufficient findings related

---

[6] Plaintiff contends the ALJ erred in giving limited weight to the assessment of Dr. White, as an examining physician. (Doc. 15 at 22). The ALJ opined the opinion was "based on a one-time examination" and Plaintiff's "answers were filtered and amplified by her husband, who was present." AR at 24. However, Dr. White noted Plaintiff's responses were "brief although relevant," and her husband "elaborate[d] on answers." *Id.* at 417. Moreover, the opinions of an examining physician may constitute substantial evidence. *Orn v. Astrue*, 485 F.3d 625, 632 (9th Cir. 2007). Therefore, the Court cannot find these reasons support giving less weight to the opinion of Dr. White.

to the medical evidence of record, and determine whether Plaintiff's limitations preclude her from work in the national economy. Because the Court finds remand is appropriate on this matter, it will not address the remaining issues raised by Plaintiff.

Accordingly, **IT IS HEREBY ORDERED**:

1. Plaintiff's motion for summary judgment (Doc. 15) is **GRANTED**;
2. Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is **REMANDED** for further proceedings consistent with this decision; and
3. The Clerk of Court IS DIRECTED to enter judgment in favor of Plaintiff Xeng Xiong and against Defendant Commissioner of Social Security.

IT IS SO ORDERED.

Dated:  **March 22, 2012**                                     /s/ Jennifer L. Thurston
                                                              UNITED STATES MAGISTRATE JUDGE